## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## IN THE WESTERN DIVISION

| | | |
|---|---|---|
| Mary Doe as next friend of John Doe 1[1], John Doe 2, and John and Jane Does 1-100, | ) ) ) ) | Civil Action No.: 2:22-cv-02657 |
| Plaintiffs, | ) ) | |
| v. | ) ) | **AMENDED COMPLAINT JURY DEMAND** |
| Varsity Brands, LLC, Varsity Spirit, LLC, Varsity Brands Holding Company, Inc., U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation, USA Federation for Sport Cheering d/b/a USA Cheer, Charlesbank Capital Partners, LP, Bain Capital, LP, Jeff Webb, individually, Gym & Studio Ops, LLC d/b/a Premier Athletics, Susan Traylor, and Dominick Frizzell, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## STATEMENT OF THE CASE

1.      Plaintiffs file this complaint by and through undersigned counsel of record against

the above-named Defendants for money damages in connection with conduct: (1) in violation of

the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, 18

U.S.C. §2255; (2) constituting a civil conspiracy in violation of the Racketeer Influenced and

Corrupt Organization (RICO) Act, Title IX of the Organized Crime Control Act of 1970, 18

U.S.C. §1962(c) and (d); (3) giving rise to common law claims of gross negligence, negligent

supervision, and assault/battery; and (4) constituting violations of contractual and/or equitable

---

[1] Given the nature of the subject matter and the potential for harm that exists against those who come forward to inform against Defendants, Plaintiffs John Doe 1 and 2 will be identified only as such in conjunction with the factual underpinnings on this complaint.

responsibilities owed to Plaintiffs.  As a direct and proximate result of Defendants' collective and individual conduct, Plaintiffs sustained and will continue to sustain actual and ongoing injuries and damages, and in support thereof they allege, upon information and belief, at all times relevant to this complaint, Defendants established a competitive environment soliciting young athletes to cross state lines with minimal parental or adult supervision to converge at pre-scheduled locations where these athletes were then exposed to drugs, alcohol, and predatory conduct by adults, including coaches choreographers, and music producers, all while publicly representing that Defendants provided a culture of safety in the sport.

2.      At all times relevant to this complaint, Defendant Gym & Studio Ops, LLC d/b/a Premier Athletics ("Defendant Premier Athletics") operated a coaching and training business with locations throughout the United States, including in Tennessee, offering tumbling and cheering instruction for children of all ages.

3.      At all times relevant to this complaint, Defendant Premier Athletics has stated that its mission is to teach young athletes to be self-confident and to do their best, and accomplishes its mission through trained and highly qualified instructors in a safe, family-friendly environment.

4.      Yet, at all times relevant to this complaint, Defendant Premier Athletics, by and through manager, Defendant Susan Traylor, allowed a coach and athlete, Defendant Dominick Frizzell, to emotionally, physically, and sexually exploit and abuse Defendant Premier Athletics' young athletes, all while under the control and putative authority of Defendants Varsity Brands, LLC, Varsity Spirit, LLC, Varsity Brands Holding Company, (collectively "the Varsity Defendants") and the Varsity Defendants' owners and affiliates, including Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation ("Defendant USASF"), Defendant USA

Federation for Sport Cheering d/b/a USA Cheer ("Defendant USA Cheer"), Defendant Bain Capital, Defendant Charlesbank, and Defendant Jeff Webb.

5.      Upon information and belief, Defendant Premier Athletics and Defendant Frizzell, along with other gyms and coaches were empowered and placed in positions of trust and authority by the Varsity Defendants, all while the Varsity Defendants knew or should have known that these same coaches and gyms were pervasively abusing athletes or allowing athletes to be abused.

6.      Upon information and belief, the scheme to anoint specific coaches and disregard safety protocols was part of an elaborate plan by the Varsity Defendants to create a pipeline of young athletes, each of whom represented a significant stream of revenue for the Varsity Defendants worth billions of dollars.

7.      As set forth in this complaint, the Defendants, together and individually have created, organized, and propagated a system of young-athlete abuse against innocent victims including Plaintiff John Doe 1 and Plaintiff John Doe 2.

8.      This is a complaint for legal and equitable relief for the victims of this scheme.

## JURISDICTION, PARTIES, AND VENUE

9.      This action arises pursuant to, and involves questions requiring the interpretation of, the laws of the United States and thus subject matter jurisdiction is conferred upon the Court by 28 U.S.C. §1331.

10.     Supplemental jurisdiction over state law claims is conferred upon the Court by 28 U.S.C. §1367(a).

3

11.     At all times relevant to this complaint, Plaintiff Mary Doe as next friend of minor Plaintiff John Doe 1, has been the mother, parent, and natural guardian of minor Plaintiff John Doe 1, and has resided in Knox County Tennessee.

12.     At all times relevant to this complaint, Plaintiff John Doe 1 has been a minor under the age of seventeen residing in Knox County, Tennessee, and an athlete formerly competing on behalf of Defendant Premier Athletics.

13.     At all times relevant to this complaint, Plaintiff John Doe 2 has been a citizen and resident of Union County, Tennessee, and an athlete competing on behalf of Defendant Premier Athletics.

14.     At all times relevant to this complaint, Defendant Gym & Studio Ops, LLC d/b/a Premier Athletics ("Defendant Premier Athletics") has been a for-profit entity organized and existing pursuant to the laws of Tennessee, with a principal place of business in Knoxville, Tennessee and with locations throughout Tennessee and the Southeastern, United States. In or around 2005, Defendant Varsity Spirit, LLC acquired Premier Athletics, and Premier Athletics became a part of the Varsity Spirit network.

15.     At all times relevant this complaint, Defendant Susan Traylor ("Defendant Traylor") has been the manager, operator and/or has been vested with control over the day-to-day operations of Defendant Premier Athletics, and has either expressly or by ratification condoned the conduct set forth more fully herein. Upon information and belief, at all times relevant to this complaint, Defendant Traylor has been a citizen and resident of Knoxville, Tennessee.

16.     At all times relevant to this complaint, Defendant Dominick "Nick" Frizzell ("Defendant Frizzell") has been a coach and athlete competing and training on behalf of

Defendant Premier Athletics and under the direct supervision of Chelsea Bowlin on behalf of the University of Tennessee, and has resided in Knoxville, Tennessee.

17.     At all times relevant to this complaint, Defendant Jeff Webb was a citizen of Memphis, Tennessee, and created, owned, operated, and controlled Defendant Varsity Brands, LLC, Defendant Varsity Spirit, LLC, Defendant Varsity Brands Holding Company, Inc., Defendant USASF, and Defendant USA Cheer, all of which did business throughout the United States, including in Knox County, Tennessee as alleged below in paragraphs 18-24.

18.     At all times relevant to this complaint, Defendant Varsity Brands, LLC (f/k/a Varsity Brands, Inc.) ("Defendant Varsity Brands") has been a for-profit entity organized under the laws of Delaware with its principal place of business in Memphis, Tennessee. It is the corporate parent company of Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation).

19.     At all times relevant to this complaint, Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation) ("Defendant Varsity Spirit") has been a for-profit entity organized under the laws of Tennessee with its principal place of business in Memphis, Tennessee.

20.     At all times relevant to this complaint, Defendant Varsity Brands Holding Company, Inc. has been a for-profit entity organized under the laws of Texas with its principal place of business in Farmers Branch in Dallas County, Texas.

21.     Throughout this complaint, Defendants Varsity Spirit, LLC, Varsity Brands, LLC and Varsity Brands Holding Company, Inc., shall be referred to as the Varsity Defendants. At all times relevant to this Complaint, either directly or through its affiliates, including those it wholly owns and/or controls, the Varsity Defendants organized, promoted, produced, and/or managed merchandise, branding, cheer camps, and competitions throughout the United States.

22.     Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation (hereinafter "Defendant USASF") is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee. Defendant USASF is controlled and funded by the Varsity Defendants as described further herein.

23.     At all times relevant to this Complaint, Defendant USA Federation for Sport Cheering d/b/a USA Cheer ("Defendant USA Cheer") has been a non-profit entity organized and existing in the state of Texas, and the governing body for sport cheering throughout the United States.

24.     At all times relevant to this Complaint, Defendants USASF and USA Cheer either directly and/or through their affiliates, which they control, have: (a) promulgated and/or enforced rules governing competitive cheer coaching, competitive cheer training, cheer camps and competitions throughout the United States; and (b) organized, promoted, produced, and/or managed cheer camps and competitions throughout the United States and furthered the goals and purposes of the conspiracy as set forth herein.

25.     Defendant Charlesbank Capital Partners, LP (hereinafter "Defendant Charlesbank") has been a for-profit entity organized under the laws of Massachusetts with its principal place of business in Boston, Massachusetts.

26.     Defendant Bain Capital, LP (hereinafter "Defendant Bain Capital") is a for-profit, publicly traded entity organized under the laws of Massachusetts, with its principal place of business in Boston, Suffolk County, Massachusetts.

27.     Venue is proper in the United States District Court for the Western District of Tennessee, Western Division, pursuant to 28 U.S.C. §1391 as at least one of the Defendants is a corporation organized and existing, and with a principal place of business in Memphis,

Tennessee, and a substantial portion of the acts and omissions complained of occurred in this district.

## FACTUAL ALLEGATIONS

### The Competitive Cheer World

28.     The cheer world has two primary aspects: scholastic, or school-based cheer, and private cheer, known as "All-stars."

29.     In competitive cheer in both private and school settings, athletes perform routines lasting for 2 minutes and 30 seconds that incorporate gymnastics/tumbling, stunts, pyramids, tossing, cheer, and dance routines all set to music.

30.     In contrast to traditional sideline cheer, which typically coincides with and supports a larger sporting event, competitive cheer is a focus unto itself.

31.     Competitive cheer requires an extreme amount of commitment from athletes and their families, with near constant training, cross-training, and frequent competition travel through multiple seasons throughout the year.

32.     This level of dedication is costly. A single season can, at minimum, cost between $3,000 to $7,000 per team member. Some families spend $20,000 or more for transportation, lodging, membership and entrance fees, as well as merchandise, uniforms, and other accessories and incidentals, incurred in connection with the numerous competitions the athletes attend throughout the year.

33.     The competitive cheer industry is enormous, comprising an estimated four million athletes throughout the United States.

34.     Given the costs of participating and competing, the competitive cheer industry is worth billions of dollars annually.

7

35.     In this world, cheer camps, clinics, and competitions are held locally, regionally, nationally, and even worldwide, and frequently require athletes to travel across state lines. These events are hosted and conducted under the guidance, certification, and rulemaking of a group of entities created, controlled, and funded by the Varsity Defendants.

36.     In 1971, Defendant Jeff Webb began his work in cheerleading as an employee at the National Cheerleaders Association working for Lawrence Herkimer, known as the original pioneer of cheer.

37.     During his work with Herkimer, Defendant Webb familiarized himself and began forming a plan to monetize the operation of cheerleading "camps" – days-long events where athletes would converge to learn new skills.

38.     In 1974, Defendant Webb left Herkimer and formed his own group, which he similarly named the Universal Cheerleaders Association. By and through Universal Cheerleaders Association, Defendant Webb grew his footprint in the cheer industry, promoting and showcasing his cheer camps, which grew throughout the 1980s.

39.     During the 1980s, Defendant Webb's cheer camp organization transformed into Varsity Spirit.

40.     As with Herkimer's association, Varsity Spirit began as a provider of cheer camps. The company would quickly expand into apparel, organizing competitions, and operating sanctioning boards in addition to the camps.

41.     Today, Varsity Spirit and its affiliates and subsidiaries, include branding and merchandise, competitions, and camps, as well as the regulatory side of cheer by and through USASF and USA Cheer.

42.     Through their various dealings in the cheer industry, at all times relevant to this complaint, the Varsity Defendants have controlled an estimated 80-90% of the market.

43.     In 2003, a group of All-Star cheerleading coaches formed an independent 501(c)(3) organization, called the National All-Star Cheerleading Coaches Congress (NACCC), to establish uniform rules for All-Star cheerleading. The group, which would promote both Varsity and non-Varsity events, met in Atlanta and created the first set of universal All-Star cheerleading rules.

44.     Within a week, Defendant Jeff Webb founded Defendant USASF.

45.     After forming Defendant USASF, Defendant Webb mandated that All-Star athletes cheering on behalf of Varsity-affiliated gyms purchase a USASF membership as a requirement to competing at Varsity-sponsored events.

46.     The NACCC found itself unable to compete with the Varsity Defendants based on this requirement. Defendant Webb proposed a merger, which informally took place in his board room in Memphis without the board of directors present. Reportedly, NACCC would become the "rules committee" of the USASF in perpetuity. However, despite this agreement, just a few years after the merger, the NACCC arm of USASF was dissolved and all rulemaking for All-Star cheer becoming vested in USASF.

47.     At the same time, in or around 2006, the Varsity Defendants promoted certain All-Star member gyms as being "USASF Certified", a seal that the industry promoted as synonymous with a warranty that the gym, its coaches, and its choreographers were deemed safe, and that the gym followed best practices related to athlete safety.

48.     Meanwhile, athletes cheering for a Varsity-affiliated gym must buy their uniforms, accessories, and other apparel from their gym. The Varsity Defendants requires gyms

to sign multi-year supply contracts whereby the gyms are paid cash rebates from Varsity Spirit, LLC for buying their merchandise and for sending the gym's athletes to Varsity events.

49.     The Varsity Defendants control every aspect of cheerleading at every level in the United States. The Varsity Defendants even own a number of gyms and cheer programs.

50.     All-Star athletes competing on behalf of Varsity-associated gyms pay monthly or annual fees to the gym as well as annual fees to the Varsity Defendants for competition attendance, uniforms, accessories, and other related fees.

51.     Gyms and coaches likewise pay monthly or annual fees to USASF, USA Cheer and the Varsity Defendants.

52.     Athletes are also unable to transfer from one Varsity-affiliated gym to another without permission. This restriction in the athlete's ability to select a gym of their choice after initially agreeing to cheer for a Varsity-gym inhibits athletes from reporting misconduct.

53.     To this day, Defendant Webb remains intimately involved and interested in the ongoing affairs of the Varsity Defendants. Jackie Kennedy, Varsity Spirit's VP of marketing, said of Defendant Webb in January of 2019, "Jeff is still teaching and leading camps alongside our summer camp instructors. His passion permeates into all of the people here at Varsity Spirit, and Jeff cares about every single employee. He takes the time to meet every new employee. He learns their name, where they are from and what they are passionate about."

54.     At all times relevant to this complaint, the Varsity Defendants and their co-conspirators use private All Star cheer gyms like Defendant Premier Athletics to gain access to paying athletes and their families, marketing that membership in a USASF Certified gym will provide the athlete with access to the highest echelon competitions in the sport and under strict safety standards.

10

55.     Meanwhile, membership in USASF, and with a Varsity-affiliated gym mandates competing in a specified number of annual varsity events.

56.     The Varsity Defendants encourage gyms to attend a minimum number of events annually in exchange for cash rebates.

57.     When attending a Varsity event, members and their families are required to purchase rooms at a designated Varsity-chosen hotel at what many families complain are inflated prices. This scheme is referred to in the cheer community as a "stay-to-play" system. Failure to utilize the Varsity room rate subjects the athlete to disqualification from the Varsity competition.

58.     Most of these events take cash-only payments at the door to attend as a spectator, and even to enter an exhibition hall selling Varsity Cheer apparel and equipment, as well as the goods and services of other cheer vendors.

59.     In addition to mandating exclusive participation in Varsity events, once young athletes join Varsity-supported, USASF All Star cheer gyms, coaches and other gym staff begin suggesting one-on-one coaching time, or closed choreography time where the parent is not allowed to attend.  This intensive personal training is offered with the promise to help the athlete rise to the next level, compete in higher divisions, win prestige and celebrity status that will enable them to cheer at the collegiate level, and possibly become coaches themselves one day. This system of promoting intensive one-on-one time with the athletes gives coaches and staff increased access to young and impressionable athletes, and corresponds to a pipeline of young athletes to fund the Varsity Defendants' system of camps and competitions, and to create future generations of Varsity coaches and Varsity-backed gyms.

60.     The Varsity Defendants and their certified gyms encourage members to pay these fees, dues, and other expenses via auto-draft or credit card.

61.     The success and celebrity status promised to these athletes who agree to pay their coaches for extra instruction was further monetized in 2011 with the creation of "Cheerlebrity," created by former South Carolina coach and gym owner, Scott Foster, which became the impetus behind the Netflix show "Cheer" that propelled Jerry Harris to fame.

62.     Cheerlebrity was a competition created by the Varsity Defendants in the image of *American Idol* which sought to promote cheer, Varsity, and All-Star gyms through a social media presence by participating cheerleaders.

63.     Upon information and belief, Defendant Frizzell was a Varsity "cheerlebrity," who enjoyed well-known status throughout the Varsity cheer community, and who was promoted on Varsity's social media platforms, as well as those of the University of Tennessee. As such, and at all times relevant to this complaint, the Varsity Defendants, Defendant Premier Athletics, and Defendant Traylor boosted Defendant Frizzell's reputation in the cheer community to obtain access to new crops of minor athletes, to boost revenues, and to boost their reputations and footprint in the cheer world.

64.     To further perpetuate this connection between athletes and coaches backed by the Varsity Defendants, upon information and belief, the Varsity Defendants encouraged parents to allow their children to travel to camps and competitions with only the coaches, choreographers, and gym owners, and further encouraged minor athletes to look up to these leaders in their sport.

65.     Allowing child athletes to travel with adults relieves the family of an immense financial burden-related to their own travel expenses.

66.     The Varsity Defendants, Defendant USA Cheer and Defendant USASF tout the safety and security of their gyms, competitions, and camps to lull parents into comfort whereby parents have no fear for the safety of their children who train with Varsity-supported coaches, at

Varsity-affiliated gyms, and who travel out of state to hotels for competitions throughout the year.

67.     The Varsity gym network also encourages athletes to relocate to sponsor or host families who are either coaches, gym owners, or live near top-ranked Varsity sponsored gyms.

68.     The system is designed to disassociate the athletes from their families, and foster closeness with the Varsity-sponsored gyms, coaches, and gym owners.

69.     Thus, to perpetuate their scheme to create an unending pipeline of new athletes, coaches, and gym owners, the Defendant Bain Capital, Defendant Charlesbank, the Varsity Defendants, Defendant USA Cheer and Defendant USASF rely heavily upon the network of coaches, going so far as to host conferences specifically for the coaches, providing tips and training in fundraising, athlete development, and business management.

70.     At these conferences, upon information and belief, coaches are encouraged to drink alcohol and engage in debaucheries, and are inundated with promises of gifts, and financial gain if the coaches continue to produce young member-athletes and promote the Varsity brand.

71.     At all times relevant to this complaint, and upon information and belief, the Varsity Defendants have perpetuated an atmosphere at their affiliate gyms, as well as in camps and competitions, that encourages alcohol and drug use, and which does not adequately promote athlete safety including from emotional, or physical harm and abuse.

72.     Upon information and belief, and at all times relevant to this complaint, the Varsity Defendants' affiliated gyms and coaches, including Defendant Premier Athletics, contracted with schools including the University of Tennessee for coaching services such as those services provided by Defendant Frizzell at Defendant Premier Athletics' Knoxville Campus.

73.     By representing a safe and superior environment, Defendants collectively sought to create a revolving door of young athletes to perpetuate the organization for years, spending tens of thousands of dollars per athlete for coaching, uniforms, camps, training, competitions, and other merchandise, until the athletes either came of age or became coaches and gym owners.

## The Varsity Defendants' Control Over the Gym Environment

74.     At all times relevant to this complaint, Defendant Webb exercised control over all aspects of All-Star cheer, including rulemaking. He was at the forefront of the conception and execution of the alleged unlawful conspiracy as set forth herein.

75.     At all times relevant to this complaint, and under the direction and control of Defendant Webb, Defendant Bain Capital, Defendant Charlesbank, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer have relied upon access to child athletes who compete at Varsity-affiliated gyms, and in Varsity competitions, and who further purchase Varsity products, uniforms, and merchandise.

76.     The Varsity Defendants created Defendant USASF through a $1.8 million interest-free loan. The 2004 non-profit charter certificate lists USASF's address to be Varsity's address.

77.     At its inception, USASF was purportedly established to be the "sanctioning body" that would regulate All-Star cheer by setting guidelines, policies, procedures, and processes to ensure an environment that was safe for young athletes in the private gym sector.

78.     In 2006, Defendant USASF began "certifying" All-Star cheer gyms with a special seal of approval that warranted the gym and its coaching staff could be trusted for cheerleader safety.

14

79.     Defendant Webb would tell a blog years later that his best marketing advice was, "to differentiate your products from your competitors and develop a strong and trusting relationship with your customers. **The best branding results usually come from building and sustaining a culture that people trust.** It is also about consistency and authenticity." (Emphasis added.)

80.     Further, Defendant USASF created a central reporting mechanism for its member gyms, such as Defendant Premier Athletics. As such, if an athlete or their family member wished to report an incident or issue to the member gym, the athlete was directed to Defendant USASF.

81.     In 2007, Defendant Webb and Varsity Spirit, LLC formed USA Cheer, which was also established to provide guidelines, policies, procedures, and processes to ensure an environment safe for young athletes throughout the cheer industry, including the All-Star competitive cheer sector.

82.     Defendant USA Cheer was also created with an interest-free loan from the Varsity Defendants. The director of education and programs, Jim Lord, has listed Defendant USA Cheer's address to be the same as Varsity's.

83.     Defendants USASF and USA Cheer were responsible for creating and enforcing guidelines, policies, procedures, and processes for reporting coaches for misconduct and taking appropriate action for that misconduct.

84.     However, Defendants USASF and USA Cheer were both operated and controlled by the Varsity Defendants in their venture to earn massive revenue through cheerleading.

85.     The Varsity Defendants controlled Defendant USASF from inception. The Varsity Defendants submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF."

15

86.    For at least the first 15 years of its existence, and upon information and belief, Defendant USASF's offices were located at Defendant Varsity Spirit's s corporate address, a Varsity representative answered the phone for USASF, USASF employees were paid directly by Varsity, and Varsity cashed checks issued to the USASF.

87.    Defendant Varsity Spirit, LLC was listed as the owner of Defendant USASF.

88.    During the operative timeframe of this complaint, the Varsity Defendants also controlled the Board of Directors for Defendant USASF. The USASF board is empowered to set policy for USASF. The Board is composed of 13 voting members, one seat each for the seven cheer competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection. Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF. As Varsity has acquired more and more of Defendant USASF's founding event producers, it has continued to expand its control of the USASF Board. Presently, the Varsity Defendants have control of 75% of the seats on the Board of Directors. The seats that Varsity does not control do not have voting rights.

89.    Defendant USASF's website is located at www.usasf.net, a URL which was once openly owned by the Varsity Defendants.

90.    The Varsity Defendants eventually began concealing ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."

91.    As with Defendant USASF, Defendant USA Cheer listed Defendant Varsity Spirit, LLC's  Tennessee headquarters as its own headquarters, and Defendant USA Cheer's board included six Varsity employees.

16

92.     Under Defendant USA Cheer's bylaws, its thirteen-member board must include members from the following seven organizations: The Universal Cheerleaders Association, CheerSport, National Cheerleaders Association, United Spirit Association, American Cheerleaders Association, Universal Dance Association, and JAMfest.

93.     Each of the seven aforementioned associations is owned by Defendant Varsity Spirit.

94.     John Patterson, a former staffer of the Nonprofit Risk Management Center who consulted on youth sports safety, said he has never heard of an arrangement quite like the one between Varsity Sprit, LLC and these non-profit governing bodies. He said Varsity Spirit, LLC's control of USASF meant, "whatever Varsity wants, Varsity can get" in terms of rules and regulation of the cheer world.

95.     Defendant Varsity's founder Jeff Webb, has publicly stated that teams performing at Varsity Competitions who wore a full uniform and accessories branded by Varsity received higher scores.

96.     Upon information and belief, this structure meant that the Varsity Defendants were entirely self-regulated and were not answerable to any independent entity.

97.     In 2010, in Cheer Coach & Advisor Magazine[2], Defendant USASF was officially quoted as saying, "Through credentialing, coaches are made aware of expectations as teachers and role models. It is the goal of the USASF to infuse good decisions into each and every credentialed coach so that they may expand the positive life experience of All-Star cheerleading and dance into the lives of the youth they encourage. USASF is recognized as the baseline of education for each individual coach and also expect these standards to be met."

---

[2] At the time of this particular issue, Defendant Webb served on the editorial board of Cheer Coach & Advisor.

98.     Defendant USASF was promoted as a means to prevent athlete harm. Instead, USASF has failed in its obligation to appropriately investigate reports of misconduct, has failed to communicate with regard to misconduct, and has further failed to operate as intended.

99.     The Varsity Defendants, through Defendants USASF and USA Cheer, can and do enforce bans of athletes, coaches, and teams in competitions for minor rule infractions like the size of hairbows and the use of glitter. However, these Defendants have repeatedly failed to enforce suspensions or bans of coaches, choreographers, and music producers who are known to have committed child sexual abuse.

100.    Defendant Varsity Spirit, LLC, through Defendants USASF and USA Cheer, has created and is responsible for oversight and enforcement of their Professional Responsibility Codes, which specifically acknowledge the threat of harm or abuse by coaches in cheer. For instance, according to the USASF Professional Responsibility Code, "Once a coach-Athlete relationship is established, a Power imbalance is presumed to exist throughout the coach-Athlete relationship (regardless of age) and is presumed to continue for Minor Athletes after the coach-Athlete relationship terminates until the Athlete reaches 20 years of age."

101.    According to its own literature, the Professional Responsibility Code is applicable to "all members," referring to Varsity-affiliated gyms.

102.    From 2014 to 2018, Defendant Charlesbank wholly owned the Varsity Defendants and thus owned Defendants USA Cheer and USASF, and provided capital to the Varsity Defendants and Defendants USA Cheer and USASF for the purpose of building the network of Varsity-affiliated private gyms and coaches throughout the United States.

103.    During this same timeframe, Defendant Charlesbank, as well as the Varsity Defendants, reaped massive financial benefits associated with the growing network of families

who came into Varsity-affiliated gyms, and who believed the Varsity Defendants' representations that they were providing safe and protective environments for families.

104.    In 2018, Defendant Bain Capital purchased the Varsity Defendants from Charlesbank for roughly $2.5 billion. At the time of the sale, Defendant Charlesbank made a new investment in Varsity alongside Defendant Bain and retained a minority stake in the business.

105.    Related to its purchase, Defendant Bain Capital stated: "This new partnership presents Varsity Brands with an exciting opportunity to continue to expand and improve our products and services while remaining steadfast to our commitment to improving student life and overall engagement…. Bain Capital's extensive consumer and technology experience and their commitment to our mission of empowering young people will help us accelerate our growth to a new level."[3]

106.    In addition, Defendant Bain represented: "For over 50 years, Varsity Brands has served as an essential force for good as part of the academic and athletic student experience…We are excited to partner with the company's experienced, committed management team to amplify the company's ecommerce operations and digital expansion, while accelerating its growth through complementary acquisitions and organic initiatives to become the go-to source for every school's sport, spirit and achievement needs."[4]

107.    Upon information and belief, Defendant Bain's accelerated growth model for the Varsity Defendants depended upon access to an ever-expanding network of young athletes who would not only purchase Varsity branded merchandise, but would also continue to attend Varsity

---

[3] *See* "Varsity Brand, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity," June 19, 2018, available at: Varsity Brands, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity | Bain Capital.

[4] *Id.*

events. In that regard, during the operative timeframe, the Varsity Defendants issued annual invoices to members, including coaches, gyms, and athletes, payment of which was mandatory and ultimately profited Defendant Bain and its minority partner Defendant Charlesbank.

108.    Meanwhile, at the time of Defendant Bain's acquisition, the Varsity Defendants were embroiled in very public litigation arising not only out of the Varsity Defendants' alleged anti-competitive tactics in acquiring gyms and curbing other event-companies, but also related to allegations of sexual misconduct by Varsity-affiliated coaches.

109.    In 2020, former Varsity-affiliated coach and "Cheerlebrity" Jerry Harris, star of the Netflix series "Cheer," was accused of soliciting sex from two children during the 2019 Varsity-competition season.

110.    In July 2022, a warrant was issued against another Varsity-affiliated coach, Erick Kristiansen, who was accused of exposing himself to his minor athletes.

111.    In August, 2022, Varsity-affiliated coach Scott Foster committed suicide amidst an ongoing investigation into allegations that he engaged in sexual misconduct with his minor athletes.

112.    Foster had previously been suspended by USASF when video-evidence came to light showing Foster drinking alcohol with his underage athletes.

113.    Despite his suspension, Foster was nevertheless openly allowed to continue coaching at his Greenville gym, and elsewhere, and was never barred from attending any Varsity-sponsored event.

114.    After the Bain acquisition, on December 7, 2020, Defendants USASF and USA Cheer announced a universal system for reporting athlete safety concerns, as well as a central repository listing ineligible coaches and individuals. Defendants USASF and USA Cheer stated

20

that these measures "will provide a robust athlete safety infrastructure readily available across the entire cheer community."

115.   This list, the "Unified Ineligibility List," is accessible online, lists the nature of the infraction, occasionally provides public documentation, and names the offender.

116.   As of the date of filing, this list included 152 names. The vast majority of the suspensions, both temporary and permanent, related to claims of sexual misconduct between minors and their coaches, choreographers, and other adults. Some of the alleged misconduct dates back more than ten years.

117.   One such suspension was from an incident that occurred at a Premier location in Franklin Tennessee, in January, 2021, where a hidden camera was found inside of a girls' restroom and changing area. Authorities noted that the camera was linked to a Premier employee, who was charged after law enforcement discovered images of 55 child athletes changing clothes.

118.   Defendant USASF listed the suspension as temporary.

119.   Far from providing security for athletes, the list is replete with temporary suspensions where the only information provided is "Member policy violated related to athlete protection," with no records or other documentation.

120.   In addition, the list does not provide the status of the investigation, and, upon information and belief, is not updated on a regular basis.

121.   In fact, Defendant USASF admits on its own website that it does not include all decisions, but rather "only those that could pose a potential risk to the broader sport community." Whether an offense rises to the level of posing a potential risk to the broader sport community is left entirely to the discretion of USASF.

122.    The vast majority of instances of misconduct included on the USASF list arise out of sexual harm or misconduct. This misconduct gave notice to all Defendants that a broader issue existed within the Varsity Defendants' cheer community.

123.    Yet, other than the list, and upon information and belief, the Varsity Defendants made few if any modifications to the internal screening process for coaches, and made no modifications to the gym and competition environment.

124.    Upon information and belief, during the interim of the allegations set forth above, the Varsity Defendants, in conjunction with Defendant USASF and Defendant USA Cheer have hosted multiple competitive events throughout the United States, during which time affiliated teams from across the country converge at a pre-selected location, and using hotels, premises, and businesses hand-selected by the Varsity Defendants.

125.    Upon information and belief, during these events, underage student-athletes would comingle with other teams, including their coaches and choreographers, either without chaperones or minimally chaperoned, and would be exposed to environments where drugs and alcohol were readily available, and where the student athletes were subject to rampant solicitation and inappropriate sexual conduct, and innuendoes, including by coaches such as Jerry Harris, Erick Kristiansen and Scott Foster.

126.    At the same time, individual gyms and coaches would receive substantial benefits from affiliation with the Varsity Defendants, including the reputational benefits of being affiliated with Defendant USASF, Defendant USA Cheer, the Varsity Defendants' brands, and monetary benefits directly linked to the number of competitions in which a gym participated as well as the number of athletes the gym brought to the competition.

127.     In this way, the Varsity Defendants and the gyms and coaches had a symbiotic relationship, where the gyms and coaches supplied the Varsity Defendants with hundreds of millions of dollars of revenue from under-age athletes, and the coaches and gyms used the Varsity Defendants' reputation in order to bolster their own reputation with student athletes.

128.     Upon information and belief, the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital relied upon the gyms and coaches to create a replenishing group of underage athletes, and future coaches, and gym owners, to provide a guaranteed stream of revenue.

129.     As such, and upon information and belief, it was contrary to the Varsity Defendants' business model to ban coaches and gyms from their system, as every coach and gym represented a pipeline of current and future revenue.

130.     Rather, when allegations about a specific coach, or Varsity affiliate were made, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer either ignored the allegations, determined the allegations were not "credible" based upon arbitrary criteria, or allowed the would-be abuser to quietly exit the Varsity-affiliated program, with the result that the accused could relocate to a new gym or facility without parents knowing about the allegations of misconduct against minors.

131.     At all times relevant to this complaint, and upon information and belief, Defendants Bain Capital and Defendant Charlesbank knew or should have known that the Varsity Defendants, Defendant USASF, and Defendant USA Cheer were not appropriately enforcing policies, processes, and procedures related to athlete safety, and that the Varsity Defendants were hosting events without regard for and in contravention to the safety of student athletes.

132.     Moreover, and upon information and belief, to incentivize coaches and gyms, Defendants Bain Capital, and Charles Bank authorized, and the Varsity Defendants offered, significant monetary benefits to increase participation in events, including by providing cash rebates, as well as in creating event environments that comingled child-athletes with adult coaches, gym owners, and choreographers, while providing these same child-athletes with access to drugs and alcohol with minimal parental or adult supervision.

133.     Upon information and belief, this environment fostered and contributed to the sexual, mental, and physical abuse inflicted upon the athletes, and gave individuals such as Defendant Frizzell unfettered access to potential victims.

134.     Upon information and belief, this competition environment was the brainchild of Defendant Jeff Webb, who used the competitions as a mechanism for his companies to establish dominance in the cheer market.

135.     During the  timeframe relevant to this complaint, Plaintiffs are informed and believe that employees of the Varsity Defendants resigned their positions because of the abuse and systemic failures they saw within the system, including failures to uniformly apply policies and procedures related to athlete safety, rampant drug use within the leadership of the Varsity Defendants, as well as alcohol and drug use by athletes during competitions, and general favoritism and promotion of teams that chose to endorse or affiliate with the Varsity Defendants, disadvantaging independent teams.

136.     Defendant Webb is currently Chairman of the board of directors of Varsity Brands, LLC. He was previously Varsity's president but resigned in 2020 amid the Jerry Harris sex abuse scandal.

137.   During the operative timeframe of this complaint, Defendant USASF received numerous reports and allegations against Defendant Frizzell as well as other coaches, choreographers, videographers, and music directors. Upon information and belief, the general response from Defendant USASF was to disregard these reports and accusations as attempts by disgruntled athletes and parents to get coaches and gyms in trouble if the athletes did not receive coveted team positions.

138.   A 2020 investigative series by journalists Marisa Kwiatkowski and Tricia L. Nadolny for USA Today revealed scores of repeat sex offenders active within USASF certified gyms and preferred vendor lists.[5] Some of the cases of which Defendants Bain Capital, Charlesbank, and the Varsity Defendants had knowledge included:

a.   A Virginia gym owner was convicted of sexual battery and assault and placed on the sex offender registry after three girls he coached at his Virginia gym came forward. As of 2020, this coach was still listed as the gym's owner and was still USASF certified. Varsity continues to invite his gym to competitions. One of his victims had to stop cheering competitively because her convicted abuser was allowed to stay involved around children and in proximity to her.

b.   A Charlotte coach who was arrested for two counts of sexual assault of a minor and lost his middle school teaching job continued to have access to minors afterward. Though the gym's owners claimed he was told he was no longer welcome to work with the gym's athletes after his arrest, he continued to appear in official social media accounts of the gym, was connected by the gym director

---

[5]   https://www.usatoday.com/in-depth/news/investigations/2020/09/18/cheerleading-cheer-investigation-sexual-misconduct-sex-offender-banned-list/3377622001/

https://www.usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

to parents for private lessons and attended a Varsity event in Florida where he was photographed posing next to the gym's athletes in a gym uniform with the word "Coach" on his shorts.

c.  A coach who had been fired from a gym and charged with child pornography was discovered to still be working in the cheer industry by the gym owner who had originally fired him. The gym owner called Varsity, who told her his background check was fine. After she went to the courthouse to get the records of his conviction and sent them to Varsity, months passed and the man continued coaching children at Varsity events through USASF gyms.

d.  A Washington gym owner was not banned by USASF until more than a year after the organization received reports in 2018 that he had been accused of sexual misconduct with minors.

139.  Moreover, Defendant USASF refused or failed to report non-member coaches and adults accused of misconduct.

140.  For instance, in June, 2022, Defendant Frizzell, a coach with Defendant Premier Athletics, was reported to Defendant USASF and the authorities for inappropriate solicitation of Defendant Premier Athletics' minor athletes, as well as sexual misconduct with minor athletes.

141.  Over a month later, Defendant Frizzell received correspondence from Defendant USASF informing him he was not currently a USASF member, and was now ineligible because of potential misconduct that violated state and federal law. Notwithstanding, Defendant USASF notified Defendant Frizzell of how he could appeal his ineligibility decision.

142.  Defendant USASF has said that not all reports of child sexual abuse warrant placing a person on USASF's public list of suspended or banned adults. Instead, they made

26

internal note of it but failed to warn parents or the cheer community of the potential danger of allowing their children around such persons without supervision.

143.   Upon information and belief, Defendant USASF has received hundreds of complaints against coaches, choreographers, videographers, and others accused of sexual misconduct.

144.    Until recently, however, Defendant USASF failed to dedicate fulltime staff to managing investigation of these complaints.

145.   Defendant USASF has been excruciatingly slow to develop policies and procedures for keeping athletes safe from sexual abuse in an industry rife with it.

146.   Meanwhile, according to its website: "USASF is the U.S. All Star Federation. It's about safety standards. It's about coaches' education. It's about providing a safe environment to allow for the continued growth of All-Star cheerleading and dance across the country. **It's about parents knowing their children are being taught using safe methods that are in accordance with the standard of care**. It's about standardization of rules from one competition to the next. It's about time." (Emphasis added).

147.   In the years since this public representation, however, Defendant USASF's gym and coach training has focused almost exclusively on avoiding physical injury to the athletes.

148.   In fact, Defendant USASF's "Athletic Performance Standards" dealt only with things like hair accessories, makeup, uniforms, choreography, and music. The general message is that Defendant USASF concerns itself more with how its athletes look than how its coaches behave.

149.   For instance, in 2012, Defendant USASF reiterated their "image and appearance policy" to address "the increasing criticism about the general appearance of our athletes during

27

competition and the unflattering media stories that have focused on how our sport is presenting its athletes, particularly those in the younger age groups."

150.   At the same time, Defendant USASF began offering, but not requiring, a $1 million sexual abuse/sexual molestation policy to gym owners through K&K Insurance.

151.   It took until 2015 for Defendant USASF to implement background checks on certified coaches and gym owners. However, Defendant USASF failed to uniformly apply the process.

152.   Defendant USASF also created the "Triple A" challenge as part of its response to the SafeSport Act that became law in 2018, shifting responsibility for reporting abuse and exploitation from the corporate entities empowered to oversee the sport onto minors and their families by telling them they should ask when posting photos to social media: "Is it Athletic? Is it Age Appropriate? What does it Amplify?" They asked for "thoughtful" social media posts to be hash-tagged with "#ThisIsAllStar and "#usasfATHLETES1st" as part of their safety plan.

153.   Meanwhile, Defendant USASF failed to follow its own procedures with respect to rampant child sexual abuse, allowing complaints to stall or delaying action when their policies clearly call for a person to be suspended or banned.

154.   At other times, Defendant USASF's policies have contradicted each other. In its complaint resolution process, Defendant USASF said its jurisdiction was only over members. But in its Safe Sport policy manual, it said it had authority and jurisdiction to investigate anyone employed by a USASF program even if they were not a member.

155.   Jim Lord, Defendant USA Cheer's director of education and programs, said in 2020 that the organization's banned list is one of the tools they use to keep athletes safe. The manner in which this oversight was performed, according to Lord, was that he had it on his

"weekly checklist" to visit search engines and use terms like "cheer coach", "athlete abuse, and "sexual assault" to find people to ban. Between June and September that year, Lord had identified five (5) names. Investigative reporters with USA Today managed to find 180 people during that same time frame. More than 140 of those had been convicted of a child sex crime and more than half of those were registered sex offenders.

156.    Also in 2020, W. Scott Lewis, partner at legal and risk management firm TNG criticized Defendant USASF's handling of reports and complaints in that they often sat on their hands and did nothing, assuming law enforcement had been contacted by someone else. He said it was not typical for organizations to wait for law enforcement action before taking their own action unless they've explicitly been asked to do so. He said, "You don't want to be on the sideline saying, 'Well, we can't do anything because law enforcement's doing it,'" Lewis said. "You want them to have the ability to engage in interim measures or your own investigation, or both." In May of 2021, Defendant USASF hired TNG to consult on its athlete safety practices.

157.    Well after the very public conviction of Jerry Harris, Defendants USASF and USA Cheer finally began to put measures in place to attempt to ensure athlete safety from predators previously certified by them.

158.    However, to access the Varsity Defendants' safety and risk management course, coaches, cheerleaders, and their families must  pay a fee.

159.    USASF also began "requiring" that all member programs "have clear, written guidelines  that prohibit adults who have contact with minors from engaging in conduct that is either inappropriate and/or illegal."

160.    Defendant USASF failed however, to provide oversight on reviewing or approving those policies, or even verifying that gyms had, in fact, enacted guidelines.

161.    Defendant USASF further undertook to create an online reporting mechanism for receiving complaints. Experts have raised concerns over the burden of this reporting process. When printed, the required forms are over 15 pages long.

162.    Moreover, the reporter must cite to the alleged rule or regulation their attacker violated, referring to a slew of different sources.  By so doing, Defendant USASF shifted its mandatory duty to report child abuse to the victim and their family.

163.    Kelli Hughes, the director of the Center for Child Policy, found Defendant USASF's reporting process to be unnecessarily complicated and burdensome.

164.    For the 2021 USASF Worlds at Disney World in Florida held in May of 2021, the organization sent out an information packet which contained athlete conduct rules but did not address coach conduct. The policy mandated one (1) adult chaperone, defined as anyone 21 of years of age or older, for every nine (9) child athletes.

165.    Webinars on athlete safety listed at the site in November 2021 included topics like "tumbling drills", "coed stunting", "building transitions", "choreography", "twisting skills theory", and "flyer stability and flexibility". Conspicuously absent at this crucial time was any training on preventing or reporting child sexual abuse or molestation.

166.    In short, Defendant Bain Capital, Defendant Charlesbank, the Varsity Defendants, and Defendants USASF and USA Cheer, have created an elaborate illusion of a safe system in order to draw more members in so they could sell more merchandise and collect more fees for events and camps, knowing their young vulnerable members were at risk and that they were doing nothing about removing the criminal coaches, affiliates, gym owners, and administrators creating that risk.

**Premier Athletics and Defendant Frizzell**

167.    As stated herein, Defendant Premier Athletics is a cheer, dance, and tumbling gym based in Tennessee, and offering its services to children as well as adults. In 2005, Defendant Varsity Spirit purchased Defendant Premier Athletics, which then became a part of the Varsity Defendants' network.

168.    At all times relevant to this complaint, Defendant Premier Athletics has been a USASF member gym, and, as such, required each of its All-star athletes, including Plaintiffs John Doe 1 and John Doe 2, to become USASF members as well.

169.    At all times relevant to this complaint, Defendant Premier Athletics has held itself out as providing "highly trained" and "highly qualified" instructors, as well as a safe environment.

170.    However, even on its website, Defendant Premier Athletics has no mechanism to report misconduct internally. Rather, Defendant Premier Athletics directs reports to Defendant USASF.

171.    Prior to becoming a Premier Athletics coach, Defendant Frizzell was a Premier Athletics athlete.

172.    At all times relevant to this complaint, Defendant Premier Athletics provided Defendant Frizzell with access to its gym, which necessarily served athletes ranging in age from as young as four years old through eighteen years of age and beyond.

173.    In fact, as part of its model, Defendant Premier Athletics advertises that it provides coaching and training services to athletes of all levels and ages, and has had competitive All-Star teams of different levels, including athletes of varying ages.

174.    Based upon Defendant Premier Athletics' business model, Defendant Premier Athletics therefore knew or should have known that athletes over the age of eighteen were

interacting with athletes who were younger than the age of consent, and had a responsibility to ensure that the adult athletes did not sexually abuse minor athletes.

175.    Defendant Premier Athletics requires that its coaches be members of Defendant USASF, and independently holds itself out as providing at least annual training to its employees, along with independent background checks, and states that "[a]ny person outside of the Premier Athletics organization that works directly with an athlete will also be required to have a USASF, USAG or USA Cheer green light…if not part of those organizations.

176.    Upon information and belief, since at least 2016, Defendant Frizzell has been a dominant figure in the cheer world, previously cheering for Defendant Premier Athletics as well as for Stingrays Steel, an All-Star team known for winning worlds as well as other national competitions.

177.    The Varsity Defendants and Defendant Premier Athletics used Defendant Frizzell's cheerlebrity status, both while Frizzell was an athlete, and later as coach, on social media and on other platforms to attract new young athletes, including Plaintiffs John Doe 1 and John Doe 2.

178.    Upon information and belief, Defendant Frizzell began cheering for the University of Tennessee in or around April, 2022.

179.    Upon information and belief, during this timeframe, Defendant Premier Athletics allowed the University of Tennessee to cheer at its Knoxville location, and also employed Defendant Frizzell as a coach.

180.    While Defendant Frizzell was an athlete and later while Defendant Frizzell was a coach, Defendant Premier Athletics provided Defendant Frizzell with access to young athletes such as Plaintiffs John Doe 1 and John Doe 2. In exchange, Defendant Premier Athletics used

Defendant Frizzell's celebrity status in the cheer world to attract new athletes to fund its program and its USASF.

181.    In or around 2019, Defendant Frizzell was an athlete competing with Defendant Premier Athletics and was allowed by Defendant Premier Athletics to interact with underage athletes in the gym.

182.    In or around 2019, Defendant Frizzell engaged in non-consensual sexual conduct with at least one minor athlete in Defendant Premier Athletics' gym, and this interaction was pervasive and ongoing.

183.    Defendant Premier Athletics knew or should have known that Defendant Frizzell was engaging in non-consensual sexual conduct with Defendant Premier Athletics' minor athletes. Nevertheless, in or around 2020, Defendant Premier Athletics made Defendant Frizzell a coach, providing private lessons and trainings, and leading camps.

184.    In late May or June of 2022, Defendant Premier Athletics, through its manager, Susan Traylor, received reports that Defendant Frizzell had engaged in sexual misconduct with some of its minor athletes.

185.    Thereafter, one of the minor athletes directly reported to Defendant USASF  that Defendant Frizzell sexually solicited him. Upon information and belief, the report indicated that Defendant Frizzell may have solicited multiple minor athletes.

186.    The reports indicated that Defendant Frizzell sent nude photographs of himself, as well as videos of Defendant Frizzell masturbating, and also that Defendant Frizzell had taken photographs of minor athletes during camp.

187.    This minor athlete further reported this conduct to local law enforcement.

33

188.    Despite these reports, Defendant Frizzell was allowed to continue accessing Defendant Premier Athletics' gym, including its Knoxville location.

189.    Defendant USASF responded by rendering Defendant Frizzell temporarily ineligible, but notified him of his right to appeal the decision, and took no other action against Defendant Frizzell.

190.    Upon information and belief, Defendant Frizzell continued to engage in private lessons with minor athletes upon Defendant Premier Athletics' premises.

191.    Only after law enforcement became involved because of the direct athlete report did Defendant Premier Athletics take any action against Defendant Frizzell, or otherwise notify its own athletes of the issue.

192.    Defendant Premier Athletics never contacted Plaintiff Mary Doe on behalf of her minor child.

193.    In addition, as recently as September, 2022, and despite multiple reports of sexual misconduct with minors, Defendant Frizzell continued to conduct camps with minor athletes, including upon Defendant Premier Athletics' premises.

194.    In September, 2022, months after first becoming aware of potential abuse against one of its minor athletes, Defendant USASF finally contacted Plaintiff Mary Doe.

195.    To this day Defendant Premier Athletics has never contacted Plaintiff Mary Doe about the potential abuse sustained by Plaintiff John Doe 1, nor have they contacted Plaintiff John Doe 1.

196.    Meanwhile, other parents have come forward to Plaintiff Mary Doe and told her that Defendants Premier Athletics and/or USASF indicated they had spoken with Plaintiff John Doe 1 and that he had declined to move forward with charges.

34

197.    At all times relevant to this complaint, Defendants as entities responsible for the welfare and oversight of children, should have reported to local law enforcement any potential issues related to abuse or sexual misconduct involving Defendants' minor athletes.

198.    As a direct and proximate result of Defendants' conduct, set forth herein and above, young athletes were imperiled, incurred significant damages, and will continue to incur damages for the foreseeable future.

## The Enterprise

199.    Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

200.    The unlawful acts alleged against Defendants Webb, the Varsity Defendants, USASF, and USA Cheer, and vicariously against Defendant Charlesbank and Defendant Bain Capital in this Complaint were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

201.    The unlawful acts alleged against Defendant Premier Athletics, Defendant Frizzell, Defendant Susan Traylor, and other Unknown Defendants who coached and owned gyms and perpetrated abuse upon minor athletes were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

202.    The officers, agents, employees, representatives, or shareholders operated under the explicit and apparent authority of their principals.

203.    Each Defendant, and its respective subsidiaries, affiliates and agents operated as a single unified entity with the common goal of taking millions of dollars from minor athletes who wanted to be a part of the competitive cheer world Defendants oversee, as well as to perpetuate a

35

pipeline of new child-athletes, coaches and gyms. Defendants' Enterprise functioned as a continuing unit throughout the conspiracy and continues its operation through the filing of this Complaint.

204.    At all times relevant to the complaint, Defendants possessed and continue to possess an ongoing organizational structure with sufficient continuity related to the Enterprise.

205.    Each Defendant participated in the operation and management of the Enterprise.

206.    The Enterprise is separate and distinct from the pattern of racketeering activity as set forth below.

207.    Whenever in this Complaint reference is made to any act, deed, or transaction of any organization, the allegation means that the Defendants and each of them engaged in the act, deed, or transaction by or through their officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the organization's business or affairs.

208.    Individuals alleged to have engaged in misconduct in violation of the laws pleaded herein are alleged to have done so on behalf of all members of the enterprise between the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, Defendant Bain Capital, and Defendant Premier Athletics. The athletes who paid to enter the competition cheer world did not know or did not distinguish between the corporate affiliations of different individuals. These organizations all affirmatively and collectively represent themselves as one All-Star family, rather than separate parents and subsidiaries.

209.    Defendants' unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate commerce in the United States through the certification of private gyms and their coaches, the uniform reporting mechanism promulgated by Defendants,

the system of rules and codes which requires that all gyms, coaches, and athletes purchase memberships, as well as the organizing, promoting, and managing cheer competitions throughout the United States.

210.    The conduct alleged herein is tied to billions of dollars of interstate commerce, with the Varsity Defendants, their governing bodies, and their parents controlling at least 80% of the competitive cheer market through membership fees, gym and coaching fees, competition fees, insurance, apparel, and travel for training and competition events all over the United States and the world.

211.    During its ownership period from 2014-2018, Defendant Charlesbank conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the competitive cheer world with the promise of a safe and superior coaching experience by joining a certified gym. Defendant Charlesbank has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so. When it sold to Defendant Bain Capital in 2018, rather than walk away from the Enterprise, Defendant Charlesbank made the conscious business decision to reinvest and retain an ownership interest in the Varsity Defendants in order to continue reaping the financial benefits of Varsity's Enterprise with the Defendant Premier Athletics .

212.    Once ownership transferred to Defendant Bain Capital in 2018, Defendant Bain Capital conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the Varsity universe of competitive cheer with the promise of a safe and superior coaching experience by USASF and USA Cheer certified gyms, coaches, and instructors.

213. Defendant Bain Capital has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so through Varsity, USASF, and USA Cheer's business Enterprise with Defendant Premier Athletics and continues to do so as set forth herein.

214. All Defendants were co-conspirators in a scheme to get as many families as possible to entrust their child athletes to these private gyms and coaches to generate massive revenue from these athletes all while Defendants were: (a) failing to properly vet the coaches by investigating backgrounds; (b) failing to properly investigate complaints of inappropriate and criminal sexual conduct by coaches and adult athletes against minors; (c) failing to report complaints of inappropriate and criminal sexual conduct against minors; (d) failing to enforce rules and regulations for chaperoning and supervision of minors; (e) failing to enforce ineligibility due to complaints regarding athlete safety; (f) taking minor athletes across state lines for the purpose or with a reckless disregard for whether the athletes would be subjected to sexual and/or physical abuse; (g) taking minor athletes across state lines and then plying them with alcohol and drugs; (h) gathering at predetermined locations to discuss and exchange notes and information related to the Enterprise including how to lure additional minor athletes and how to maximize profits; (i) creating images and videos of children under the influence of drugs and alcohol, and engaging in sex; (j) sending said images over the mails and wires; (k) sending and collecting bills and invoices across the mails and wires despite the fraud perpetrated by Defendants; and (l) disseminating fraudulent misrepresentations through mail and wire as to the safety they guaranteed through a sham certification process.

### The Abuse

    a.  *Plaintiff John Doe 1*

215.    Plaintiff John Doe 1 began cheering in the 5th grade, around 2017, when he was

11 years old.

216.    In or around 2020, Plaintiff John Doe 1 began cheering full-time for Defendant

Premier Athletics.

217.    As set forth herein and above, at all times relevant to this complaint, Defendant

Premier Athletics has been a USASF-member gym. As such, while Plaintiff John Doe 1 cheered

for Defendant Premier Athletics, if he wanted to cheer at another gym, he would still be required

to pay membership dues to Defendant Premier Athletics unless Premier expressly authorized the

transfer.

218.    Moreover, Defendant Premier Athletics would regularly check on Plaintiff John

Doe 1's status as a USASF member and remind Plaintiff John Doe 1 as well as Mary Doe to

renew or update his membership if he had not done so.

219.    As a USASF-member, Defendant Premier Athletics directs athletes to contact

Defendant USASF to report an issue of athlete-safety.

220.    Meanwhile, Defendant USASF has held itself out as responsible for athlete safety

in the All-star context. In a December 7, 2020 press release about its Reporting and Ineligibility

list, Defendants USASF and USA Cheer, by and through representative Lauri Harris, stated: "We

took these latest steps to ensure that our processes for reporting abuse are clear and consistent

throughout the cheer community, and to facilitate the identification of individuals deemed a

threat to participants."

221.    Plaintiff John Doe 1 first became aware of Defendant Frizzell in 2018 or 2019.

Defendant Frizzell was a "cheerlebrity," who cheered for the Stingrays Steel All-Stars, a

nationally renowned All-Stars team. During this timeframe, Defendant Frizzell also had a huge

following on social media. Defendant Frizzell later cheered for the University of Tennessee, and the University of Tennessee cheer coach contemporaneously coached at Defendant Premier Athletics.

222.   In or around November or December of 2021, Defendant Frizzell followed Plaintiff John Doe 1 on Snapchat. Defendant Frizzell knew that Plaintiff John Doe 1 was only fourteen-years old at the time.

223.   Meanwhile, at all times relevant to this complaint, Defendant Frizzell was in his early twenties.

224.   Beginning in January, 2022, Defendant Frizzell began sending sexually explicit messages and photographs of himself to Plaintiff John Doe 1, including photographs of Defendant Frizzell's penis, and videos of Defendant Frizzell masturbating.

225.   On January 29, 2022, Defendant Frizzell sent photographs of himself in his underwear to Plaintiff John Doe 1 and requested that Plaintiff John Doe 1 send similar photographs.

226.   Around the same timeframe, February, 2022, Plaintiff John Doe 1 and a fellow athlete, also an underage male with Defendant Premier Athletics, realized that Defendant Frizzell had been contacting both of them and asking for sexually explicit photographs and content.

227.   On or around February 26, 2022, Plaintiff John Doe 1's fellow athlete informed Plaintiff that he warned Defendant Frizzell in a message to stop behaving in a predatory manner.

228.   Several days later, Plaintiff was talking with another underage male athlete from Premier, who indicated that Defendant Frizzell had sent sexually solicitous text messages, photos, and videos to the athlete.

229.    On April 16, 2022, Defendant Frizzell asked Plaintiff John Doe 1 to meet him. When Plaintiff John Doe 1 arrived, Defendant Frizzell was intoxicated. Moreover, Defendant Frizzell had requested that Plaintiff smoke marijuana before meeting him.

230.    During this encounter, Defendant Frizzell held Plaintiff John Doe 1, and stroked his back and neck. Plaintiff then became so sick from smoking marijuana that he vomited.

231.    Less than a month later, Defendant Frizzell once again reached out to Plaintiff John Doe 1 to meet up with him. During this encounter, Defendant Frizzell was intoxicated to the point that he became ill.

232.    On May 27 through 28, Defendant Frizzell contacted Plaintiff John Doe 1 to meet with him. During this encounter, Defendant Frizzell and Plaintiff John Doe 1 engaged in oral sex.

233.    Shortly thereafter, Plaintiff John Doe 1 changed to a new gym. His interaction with Defendant Frizzell was one factor in the move.

234.    In June of 2022, one of Plaintiff John Doe 1's fellow athletes at Defendant Premier Athletics made a report to Defendant Susan Traylor about Defendant Frizzell's criminal and sexually inappropriate behavior with minor athletes at Premier.

235.    Neither Defendant  Traylor nor anyone from Defendant Premier Athletics contacted Plaintiff John Doe 1 or his mother Mary Doe.

236.    Upon information and belief, since the date this information has come forward, Defendant Premier Athletics told the other minor athletes not to contact Plaintiff John Doe 1 to discuss the allegations.

237.    On July 12, 2022, USASF sent Defendant Frizzell a letter notifying him of a report made to Defendant USASF alleging violations of state or federal law; violations of the

USASF Professional Responsibility Code, SafeSport Code and/or the USASF Minor Athlete Abuse Prevention Policies.

238.    In July, 2022, Defendant Frizzell sent Plaintiff a photo of the USASF letter that referenced the report against him.

239.    In the July 2022 message to Plaintiff John Doe 1, Defendant Frizzell bragged to Plaintiff that Defendant Frizzell was "not permanently banned" and that Defendant Susan Traylor told Defendant Frizzell that she wasn't going to fire Defendant Frizzell.

240.    Furthermore, Defendant Frizzell sent Plaintiff John Doe 1 numerous messages threatening the minor athlete who made the initial report.

241.    The same week Defendant Frizzell received the report from USASF, he was working at UCA cheerleading camps with minor children, and posting on social media about his activities with the University of Tennessee cheer team.

242.    Defendant Varsity's Instagram account "liked" Defendant Frizzell's posts.

243.    During this timeframe, Defendant Frizzell was a Varsity rep and had a discount code that followers could use, which was authorized and condoned by Varsity.

244.    In July, Plaintiff John Doe 1 and Mary Doe understand that Defendant Premier Athletics questioned three underage athletes, including the athlete who reported Defendant Frizzell. Upon information and belief, all of the athletes reported Defendant Frizzell's interactions with Plaintiff John Doe 1.

245.    Once again, no one from Defendant Premier Athletics contacted Plaintiff John Doe 1 or Mary Doe.

246.    Thereafter, Defendant Frizzell contacted Plaintiff John Doe 1 in an attempt to influence how Plaintiff John Doe 1 responded to questions and inquiries about his interaction

42

with Defendant Frizzell; however, until September, no one ever reached out to Plaintiff John Doe 1 or his family to ask about the allegations or determine whether Plaintiff had been subjected to sexual solicitation or abuse by Defendant Frizzell.

247. In early September of 2022 the owner of Plaintiff John Doe 1's *new* gym—not affiliated with Premier—contacted Plaintiff John Doe 1's mother, and told her that Defendant Premier Athletics was investigating allegations of abuse against Defendant Nick Frizzell, and that the allegations included sexually explicit messages and sexual encounters with Plaintiff John Doe 1.

248. Upon information and belief, Plaintiff John Doe 1's new gym was tipped off by an anonymous source at Defendant Premier Athletics who indicated all of Defendant Premier Athletics' coaches knew about the allegations.

249. As it was explained to Plaintiff John Doe 1 and his mother Mary Doe, someone made a report against Defendant Frizzell to Defendant Premier Athletics, who then allegedly reported to Defendant USASF. The entire investigation was handled internally, including determining what witnesses would be contacted about Defendant Frizzell's conduct.

250. Ultimately, Defendant Premier Athletics' bungled internal investigation determined that insufficient proof existed to hold Defendant Frizzell accountable. Defendant Premier Athletics based its determination, at least in part, on the fact that Plaintiff John Doe 1 was no longer with its gym.

251. During the entirety of this investigation, Defendant Frizzell continued to coach at Defendant Premier Athletics, and continued to interact regularly with underage athletes during camps.

252.    Defendant Frizzell continued to tumble and cheer at Defendant Premier Athletics, even posting videos of himself inside the gym in late August of 2022, over a month after Defendant Frizzell received the letter from Defendant USASF notifying him of the reports of misconduct.

253.    Defendant Premier Athletics and its owners and managers were provided courtesy copies of the July letter from Defendant USASF to Defendant Frizzell.

254.    Moreover, Defendant Premier Athletics never contacted Plaintiff John Doe 1 or Mary Doe related to the allegations, despite the fact that Plaintiff had purportedly been identified as a potential victim of abuse.

255.    Plaintiff John Doe 1 and Mary Doe's only notification about the alleged investigation of Defendant Frizzell came from an unrelated third-party gym owner who was not affiliated with Defendant Premier Athletics or Defendant Frizzell.

256.    On September 15, 2022 and September 16, 2022, Plaintiff John Doe 1 and Mary Doe made a report about the potential abuse to law enforcement, which was forward to the Department of Child Services. She further reported to Defendant USASF.

257.    Since these allegations have come to light, Defendants Premier Athletics and Defendant USASF have published notices in an effort to distance themselves from Defendant Frizzell. Meanwhile Defendant Frizzell continues to practice at Defendant Premier Athletics' gym, which hosts the University of Tennessee cheer team, and has also worked at cheer camps with underage athletes.

258.    On September 18, 2022, after Plaintiff John Doe 1 and his mother made their report about Defendant Frizzell's sexual abuse of Plaintiff, Defendant Premier Athletics posted a statement on Instagram, claiming it filed an "additional report" with law enforcement. The post

further claimed that Defendant Premier Athletics "immediately reported to law enforcement and USASF"

259.    This post provided no information about why Defendant Premier Athletics would have made a second report to law enforcement some three months after it was first made aware of the allegations against Defendant Frizzell.

260.    On September 20, 2022, Defendant Varsity Spirit's president Bill Seely sent a message to gym owners and coaches "reaffirming Varsity All-Star's long-standing commitment to athlete safety," touting itself as the "gold standard" in cheer and dance.

261.    Plaintiff John Doe 1 just renewed his USASF membership in September, 2022, and Mary Doe and John Doe 1 have paid his membership every year, in part for promises that this membership would provide a safe and healthy gym environment.

 *b. Plaintiff John Doe 2*

262.    At all times relevant to this complaint, Plaintiff John Doe 2 has been an All-Star athlete and a member of Defendants Premier Athletics and USASF.

263.    Plaintiff John Doe 2 met Defendant Frizzell at Defendant Premier Athletics' gym in 2018, when Plaintiff John Doe 2 was fourteen years old, and Defendant Frizzell was nineteen.

264.    At the time they met, Plaintiff John Doe 2 and Defendant Frizzell were both athletes competing on behalf of All-star teams at Defendant Premier Athletics' north and west gyms, respectively.

265.    When Plaintiff John Doe 2 was just fourteen years old, Defendant Frizzell initiated contact with Plaintiff John Doe 2 via snapchat, sending nude photographs of himself to Plaintiff John Doe 2 and asking Plaintiff John Doe 2 to reciprocate.

266.     When Plaintiff John Doe 2 was approximately sixteen years old, Defendant Frizzell finally convinced Plaintiff John Doe 2 to meet up, and they began to engage in oral sex and other sexual conduct.

267.     This sexual interaction continued for years, during which time Defendant Frizzell was still an athlete with Defendant Premier Athletics, as was Plaintiff John Doe 2.

268.     When Defendant Frizzell turned twenty-one, he told Plaintiff John Doe 2 that he could get in trouble for having sex with Plaintiff John Doe 2. Nevertheless, the conduct continued.

269.     Defendant Frizzell and Plaintiff John Doe 2 engaged in oral sex and other sexual activities on dozens of occasions, sometimes at relative's houses, or apartments of mutual friends.

270.     Upon information and belief, other athletes at Defendant Premier Athletics knew of the ongoing sexual relationship between Defendant Frizzell and Plaintiff John Doe 2, yet no administrator, coach, or other adult at Defendant Premier Athletics ever questioned Defendant Frizzell's continued interaction with Plaintiff John Doe 2 or any other underage athlete.

271.     During the timeframe Defendant Frizzell engaged in sexual contact with Plaintiff John Doe 2, an underaged minor incapable of consent, Defendant Premier Athletics hired Defendant Frizzell as a coach for teams of underage athletes.

272.     To this day, Plaintiff John Doe 2 is a member of Defendant USASF, and further has paid annual dues to keep his membership with Defendant USASF current.

## JOINT AND SEVERAL LIABILITY

273.     Defendants are jointly and severally liable for the damages and injuries sustained by Plaintiffs, as Defendants' individual and collective actions and omissions actually and

proximately caused Plaintiffs' past, present, and ongoing injuries.   Plaintiffs are entitled to damages pursuant to the laws of the State of Tennessee and the United States of America, including but not limited to the following:

    a.   Compensatory, actual, and consequential damages;

    b.   Statutory damages;

    c.   Punitive damages;

    d.   Reasonable attorneys' fees and costs;

    e.   Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

### COUNT I
### VIOLATION OF THE PROTECTING YOUNG VICTIMS
### FROM SEXUAL ABUSE ACT, 18 U.S.C. §2255
### (ALL DEFENDANTS)

274.   Plaintiffs hereby reallege the preceding paragraphs as if repeated verbatim herein.

275.   This claim is brought against all Defendants, with the specific acts complained of performed against minors by Defendant Frizzell and other Unknown Defendants, with the specific knowledge and aid of Defendant Susan Traylor, and Defendant Premier Athletics and enabled by the ongoing certification and ratification of the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital.

276.   Under the statute, a "covered individual" means "an adult who is authorized by a national governing body, a member of a national governing body, or an amateur sports organization that participates in interstate or international amateur athletic competition, to interact with a minor or amateur athlete at an amateur sports organization facility or at any event sanctioned by a national governing body, a member of a national governing body, or such an amateur sports organization."

47

277.    Under the statute, the term "event" includes travel, lodging, practice, competition, and medical treatment.

278.    Defendants Frizzell, Traylor, and the other Unknown Defendants, qualify as covered individuals and the facts of this case bear out that abuse occurred at events defined by the statute.

279.    Defendant Frizzell, Defendant Traylor, and Defendant Premier Athletics were held out by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital as being part of a network of safe and trustworthy cheer coaching gyms.

280.    Plaintiffs were minors at the time they were sexually abused and assaulted, sexually exploited, transported across state lines for illegal sexual activity, and used in creating illegal and obscene digital materials in contravention of 18 U.S.C §§ 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, and 2223, thus constituting violations of 18 U.S.C. §2255.

281.    Plaintiffs have suffered personal injuries as a result of these violations of law.

282.    Plaintiffs are entitled to damages pursuant to the laws of the United States of America, including but not limited to the following:

   a. Compensatory, actual, and consequential damages, or, in the alternative, liquidated damages in the amount of $150,000;

   b. Reasonable attorneys' fees and costs;

   c. Punitive damages; and

   d. Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT II
## FOR CIVIL CONSPIRACY IN VIOLATION OF THE RICO ACT PURSUANT
## TO 18 U.S.C. §1962(c) and §1962(d)
## (ALL DEFENDANTS)

283.   Plaintiffs hereby reallege the preceding paragraphs as if repeated verbatim herein.

284.   This count is brought against all Defendants.

285.   United States law makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…" 18 U.S.C. §1962(c).

286.   Each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each of them is capable of holding, and does hold, "a legal or beneficial interest in property."

287.   Defendants' activities include at least two (2) acts of racketeering activity since at least 2003. Accordingly, Defendants' conduct constitutes a pattern of racketeering activity. 18 U.S.C. § 1961(5).

288.   The racketeering activity is set forth in paragraphs and includes violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud[6]), and 18 U.S.C §§ 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, and 2223 (sexual exploitation of minors and creating obscene materials) as set forth in paragraph 185.

289.   As set forth herein, the Varsity Defendants, Defendant USASF, Defendant Premier Athletics, Defendant Frizzell, and Defendant Traylor formed an association-in-fact Enterprise within the meaning of 18 U.S.C. § 1961(4).

---

[6] The allegations set forth herein and above at paragraphs 21, 24, 32, 35, 37,  45, 47, 50, 51, 54, 55, 56, 57, 60, 64, 66, 69, 72, 80, 101, 107, 138(a)-(d), 140, 158, 166, 168, 175, 198, 199, 200, 206, 208, 209, 210, 212, 222, and 249 constitute fraud committed via the mails and wires, and further constitute predicate acts.

290.    Defendant Charlesbank and Defendant Bain Capital agreed to facilitate this Enterprise by funding its ongoing operation in order to obtain financial benefit of its revenues.

291.    This Enterprise as previously described in this Complaint, consists of a group of persons associated together for the common purpose of recklessly, intentionally, and willfully endangering the Plaintiffs as minor athletes by exposing them to illegal sexual abuse, imagery, and exploitation while assuring the athletes and their parents they were particularly safe in exchange for money.

292.    The Defendants, and all of them in concert with the Enterprise, were engaging in misleading and fraudulent messaging to children and their families which they knew or should have known was endangering children who were not in a position to discover the danger since Defendants were concealing the danger and failing to report it, acting in reckless indifference to the safety of the children in the name of growing profits.

293.    In 2014, Defendant Charlesbank funded the purpose of this Enterprise.

294.    In 2018, Defendants Bain Capital took over a role in funding the purpose of this Enterprise in place of Defendant Charlesbank.

295.    The Varsity Defendants, Defendant USASF, Defendant USA Cheer, and Defendant Premier Athletics acted in concert to commit the predicate acts of child sexual exploitation, kidnapping, dealing in obscene materials involving minors, mail fraud and wire fraud as set forth in the preceding paragraphs.

296.    The funding, materials, and premises provided by the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital and the communication of particular trust and safety carried out by Defendant USASF facilitated the commission of these predicate acts by

Defendant Premier Athletics, Defendant Frizzell, Defendant Susan Traylor, and other Unknown Defendants in the commission of crimes against children.

297.    The Defendants knew or should have known that inappropriate contact was occurring between coaches and minor athletes based on the one-on-one coaching being marketed and the travel of these children across state lines with the coaches who stayed in hotel rooms with them and had been rumored, and even captured on camera, engaging in illegal and inappropriate acts with the minors.

298.    Moreover, the Defendants, by and through their own investigations, admissions, and reporting systems, knew or should have known that high levels of inappropriate sexual misconduct were occurring or was likely to occur within USASF-member gyms, and therefore had a heightened responsibility to ensure the safety of minor athletes from this specific harm.

299.    The Defendants owed a duty to the minor Plaintiffs, and their families, to disclose reports of inappropriate behavior and sexual relationships with children and to report crimes alleged against them.

300.    The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

301.    The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

302.    The fraudulent mail and/or wire messages include, for specificity, but are not limited to the following:

    a.  USASF Athlete Protection Messaging at the website and via email on November 16, 2017.

b.  The 2020 USASF press release related to the Restricted and Ineligible list, which was described as an effort to protect athletes from harm.

c.  In 2021, USASF's website falsely claimed that they were requiring background checks in 2015 of "all coaches and adult members". However, this was untrue. Background checks were only required for entry into the "warm up room" at competitions. It was never implemented with respect to coaching children or being around them in any capacity outside their competition routine.

d.  At this same time on their website in 2021, USASF also falsely claimed that "two years earlier" in 2017 they made SafeSport's athlete protection education a mandatory requirement for all coaches and adult members. However, this is impossible since the SafeSport Act was not signed into law until February of 2018.

e.  Consecutively, on May 10, 2018 and May 16, 2019, the period just before Worlds at Disney, USASF disseminated the following messaging: "Athlete Safety is our #1 Priority! Our mission includes 'strive for a safe environment for our athletes.' To the USASF, safety extends beyond our Cheer or Dance safety rules for performance. We're committed to helping our members create the safest overall environment for every All Star athlete, so we've made resources available for use in gyms and studios."

f.  However, in these resources, USASF continued to provide messaging that child sexual abuse and exploitation by predators was an outside problem that could be prevented by paying more attention to how cheerleaders were presenting themselves on social media.

g.  USASF, in a tired and outdated sexist trope disseminated in July of 2019, shifted the blame to child athletes warning them the "risk and responsibility" of sexual exploitation and objectification required them to "make better choices" about their appearance to "minimize the risk[.]" It did this with full knowledge of repeated reports that the industry was rife with abuse among its own coaching and gym owner ranks and that they were actively concealing these predators so that they could continue to feed the revenue stream.

h.  Annual USASF renewals mandated for each and every athlete, coach, and member gym that carried the equivalent of a warranty related to safety.

i.  USASF's athlete protection messaging continued at this time to primarily address athlete safety from sexual exploitation and abuse from the perspective of how athletes were presenting themselves through appearance and how that might affect the brand's image through an "image and appearance policy".

303.   Plaintiffs had a property interest in their membership dues paid as set forth above and in the continued ability to cheer competitively, which Defendants had repeatedly enticed them to do in order to obtain social media fame which they could monetize, obtain scholarships to cheer and/or stunt at the college level, to become cheer coaches themselves and obtain the "legend status" their coaches boasted of, to become gym owners, or to become event promoters themselves.

304.   Plaintiffs were falsely imprisoned by their abusers, who threatened them if they would not continue allowing the abuse or reported it that their abusers would tell their parents, their teammates, and others in the cheer community what they had done. Plaintiffs further were

restricted from switching gyms without a release by the gym owner, creating a situation where an abuser could refuse to allow his victim to escape his abuse.

305.    Plaintiffs' abuse caused damage that prevented them from realizing these future financial and business opportunities they and their families invested in under the promise of financial reward because they can no longer continue to cheer.

306.    In some instances, Plaintiffs, as described above, were retaliated against, bullied, harassed, assaulted, and ostracized from their gyms, and their reputations intentionally damaged by Defendant USASF gym owners and coaches and their staff in retaliation for reporting sexual abuse, in direct contravention of Defendants USASF and USA Cheer rules.

307.    Plaintiffs were also faced with the choice of either changing gyms and suffering financial penalties and consequences, or remaining in the gym with their abuser.

308.    The actions of the Enterprise and its conspirators were the direct and proximate cause of these injuries to the Plaintiffs.

309.    But for the fraudulent assurances to their parents that the gyms and coaches were certified safe, the abuse would not have occurred causing the injuries described above.

310.    Plaintiffs are entitled to damages pursuant to the laws of the United States of America, including but not limited to the following:

    a.  Compensatory, actual, and consequential damages, trebled in accordance with the statute;

    b.  Reasonable attorneys' fees and costs;

    c.  Punitive damages; and

    d.  Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

## COUNT III
## GROSS NEGLIGENCE
## (ALL DEFENDANTS)

311.    Plaintiffs hereby reallege the preceding paragraphs as though repeated verbatim herein.

312.    Plaintiffs bring this claim for gross negligence against all Defendants.

313.    At all times relevant to this Complaint, Defendants have been responsible for the safety, health, and welfare of the minor athletes who were members of Defendants USASF, and USA Cheer, participants in the Varsity Defendants' events, and under the care, custody, and control of each of the Defendants, respectively.

314.    Defendants are aware of dangers associated with the sport of cheer, including risks associated with inappropriate, and non-consensual sexual touching, emotional, and physical abuse by coaches, choreographers, videographers, and by fellow athletes who are of-age against minor athletes.

315.    At all times relevant to this Complaint, Defendants have created rules specifically intended to address the risks of sexual, physical, and mental exploitation of minor athletes by coaches, and adults who come into contact with the athletes by virtue of the adults' position of power.

316.    Despite this, at all times relevant to this Complaint, Defendants have committed, and/or have been aware that violations to their internal policies, processes, procedures, and guidelines related to athlete safety, and, in particular, safety against harm from sexual, physical, and emotional abuse and exploitation has happened on a regular and continuous basis by and through Defendants USASF and USA Cheer certified gyms, coaches and affiliated adults.

317.    Defendants know, in fact, that one-on-one coaching is an enhanced feature of private gym cheer coaching that generates a great deal of money for all Defendants in the enterprise with the promise of greater success for the minor athlete.

318.    Defendants are also aware of the close personal relationships many of these coaches and affiliated adults form with the minor athletes who the adults gain access to by virtue of their USASF and USA Cheer certification and through the USASF member-gym network.

319.    Defendants are further aware that, despite the known dangers, coaches and adult athletes routinely travel alone with minors, including across state lines, even staying in the same hotel rooms with no other chaperone, during moneymaking cheer competition events, camps, or training sessions which enrich the enterprise.

320.    And when complaints or reports have surfaced, or social media images and videos circulate depicting illegal activity with minors, Defendants sweep it under the rug, do not report to any agencies, do not permanently strip coaches of their eligibility, do not appropriately enforce bans, and often rally around coaches and members who have been accused of illegal conduct with minors, ostracizing families who have complained or reported.

321.    Defendants' actions and omissions, by and through their authorized agents, were unreasonable, constituted the total absence of care, and breached duties owed to Plaintiffs, and actually and proximately contributed to and/or caused damages.

322.    Defendants' actions and omissions as described above, by and through authorized agents, were in violation of Defendants' own policies.

323.    Each incident of abuse and exploitation detailed in this matter constitutes a separate occurrence.

324.     Plaintiffs are entitled to damages pursuant to the laws of Tennessee, including but not limiting to the following:

     a.   Compensatory, actual, and consequential damages;

     b.   Punitive damages; and

     c.   Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

**COUNT IV**
**NEGLIGENT SUPERVISION**
**(VARSITY DEFENDANTS, DEFENDANT USA CHEER, DEFENDANT USASF, DEFENDANT PREMIER ATHLETICS, DEFENDANT TRAYLOR)**

325.     Plaintiffs hereby reallege the foregoing paragraphs as though repeated verbatim herein.

326.     This claim is brought on behalf of the individual Plaintiffs who have been subjected to sexual abuse, assault and battery, and who were subjected to sexual exploitation by an a duly authorized agent and/or representative.

327.     During the operative timeframe of this complaint, Defendant Frizzell was an adult athlete competing and training, and later coaching, on the premises of Defendant Premier Athletics, a USASF certified gym owned, operated and controlled by the Varsity Defendants, and managed by Defendant Traylor.

328.     At all times relevant to this complaint, the Varsity Defendants, Defendant USASF, USA Cheer, Defendant Premier Athletics, and Defendant Traylor, had a duty to protect minor athletes under their care and control from harm, and purported to provide this protection through certification, training and additional actions.

329.     Despite claiming to conduct background checks, to train, and to remove eligibility certification from coaches or gyms where complaints or reports of the foregoing conduct have

been made, Defendants continue to let these gyms, coaches, and adult athletes operate in order to generate income for the enterprise.

330.   Furthermore, Defendants failed to report these criminal activities to law enforcement agencies in favor of preserving the reputation of the enterprise so that trust in its safety continues to generate income for the enterprise.

331.   Defendants' business model relies upon certifying private gyms and coaches pursuant to Defendant USASF's standard, which purports to place athlete health and safety above all else.

332.    In perpetuating a business model built on trust and athlete safety, Defendants specifically undertook a duty to ensure that reputation for trust and safety was earned and that dangerous individuals committing atrocious illegal acts were removed from the competitive cheer network Defendants oversaw.

333.   Defendants breached this duty in a number of particulars including by failing to supervise coaches and adult athletes who had routine and repeated interaction with minors, including the Plaintiffs, or otherwise disregarding reports of abuse of minors going so far as to allow coaches who were accused of such conduct to remain working with minor athletes or to transfer to other gyms without notifying their current gym of the allegations.

334.   In addition, and upon information and belief, at all times relevant to this complaint, Defendant USASF allowed gyms to unilaterally change owners when an athlete safety issue was reported. Defendant USASF further failed to follow up on who was actually operating the gym, and whether or not a noneligible coach, even one under criminal investigation, was continuing to work with minor cheer competitors.

335.    Defendants' grossly negligent, willful and wanton conduct, set forth more fully herein directly and proximately caused Plaintiffs' injuries.

336.    As a direct and proximate result of Defendants' conduct, the Plaintiffs have been damaged.

337.    Plaintiffs are therefore entitled to a judgment against Defendants, and for such actual and consequential damages, as well as for punitive damages, in an amount to be determined by a jury trial.

**<u>COUNT V</u>**
**RESPONDEAT SUPERIOR**
**(AS TO DEFENDANT PREMIER ATHLETICS)**

338.    Plaintiffs hereby reallege the foregoing paragraphs as though repeated verbatim herein.

339.    At all times relevant to this complaint, Defendant Premier employed and retained Defendant Traylor and Defendant Frizzell as a manager and coach, respectively, and authorized Defendant Frizzell access to minor athletes including Plaintiff John Doe 1 and Plaintiff John Doe 2 set forth herein.

340.    At all times relevant to this complaint, Defendants Frizzell and Traylor were acting in the course and scope of their employment, as authorized representatives of Defendant Premier Athletics.

341.    As such, at all times relevant to this complaint, Defendant Premier Athletics was as responsible for the actions of Defendant Frizzell and the Unknown Defendant coaches as though they undertook the actions of the Defendant coaches themselves.

342.    As set forth herein, Defendant Frizzell committed unspeakable acts against Plaintiffs John Doe 1 and John Doe 2 and other Doe Plaintiffs including physical, mental, and emotional abuse, rape, assault, and other battery.

343.    This conduct directly and proximately caused Plaintiffs to sustain continuing and ongoing injuries, including physical and emotional damages.

344.    Plaintiffs therefore seek an order from this court against Defendants, and are further entitled to actual, consequential, and such additional damages, including punitive damages as this court deems just and proper.

## COUNT VI
## ASSAULT/BATTERY
## (DEFENDANT FRIZZELL, AND UNKNOWN DEFENDANTS)

345.    Plaintiffs hereby reallege the foregoing paragraphs as though repeated verbatim herein.

346.    As set forth herein, Defendant Frizzell and other Unknown Defendants, did illegally commit unwanted and nonconsensual sexual touching of the Plaintiffs and others.

347.    Said touching constituted sexual assault and sexual battery on these named Plaintiffs and others.

348.    As a direct and proximate result of these Defendants' conduct, set forth more expressly above, Plaintiffs experienced bodily injury, physical pain and suffering, and mental anguish and are entitled to an award of actual damages in an amount to be determined through a trial of this matter.

## COUNT VII
## BREACH OF CONTRACT
## (AS TO THE VARSITY DEFENDANTS AND DEFENDANT USASF)

349.    Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

350.    At all times relevant to this complaint, Plaintiffs had duly executed contracts with the Varsity Defendants and Defendant USASF where, in exchange for valuable consideration from Plaintiffs, Defendants agreed to provide a competitive environment that was safe, secure, and free from harm, specifically physical and sexual abuse.

351.    As set forth herein, during the course of these contractual agreements, Plaintiffs were subjected to severe and oppressive abuse, physically and mentally, including during camps, and at gyms hosted and sponsored by the Varsity Defendants under the governance of Defendant USASF.

352.    During the term of these agreements, the Varsity Defendants and Defendant USASF failed to provide Plaintiffs with a safe and secure environment, including by enforcing the policies, procedures, and policies expressly adopted by Defendant USASF.

353.    These failures on the parts of the Varsity Defendants and Defendant USASF constitute violations of the fundamental and material terms of the agreements between Plaintiffs, and the Varsity Defendants and Defendant USASF.

354.    The Varsity Defendants' and Defendant USASF's failures were so egregious and unconscionable as to render the agreements null and void.

355.    As such, Plaintiffs seek an order from this court finding that Defendants' conduct constitutes a breach of the contractual arrangement between Defendants' and Plaintiffs, rescinding said contracts, and remitting the valuable consideration Plaintiffs paid to Defendants during the relevant timeframe, as well as for all such attorney's fees, costs, and interest to which Plaintiff's may be entitled.

### COUNT VIII
### UNJUST ENRICHMENT
### (AS TO THE VARSITY DEFENDANTS, DEFENDANTS PREMIER
### ATHLETICS, BAIN CAPITAL, AND DEFENDANTS USA CHEER AND USASF)

356.     Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

357.     As set forth herein, the cheer industry represents a multi-billion-dollar enterprise where each young athlete spends tens of thousands of dollars during the length of his or her student-athlete career toward gym memberships, private lessons, uniforms, accessories, competition fees, and membership with Defendants USA Cheer and USASF.

358.     At all times relevant to this complaint, Plaintiffs conferred non-gratuitous benefits upon Defendants including annual competition and membership fees, as well as continuous revenue toward uniforms, accessories, private training, and other monetary benefits.

359.     Defendants realized the value of these benefits, including steady annual revenue per athlete.

360.     To date, none of the benefits Defendants realized have been returned or otherwise disgorged.

361.     Under the circumstances set forth herein and above, it would be inequitable for Defendants to retain the benefits conferred by Plaintiffs including through Plaintiffs' annual membership fees and competition fees.

362.     Plaintiffs are therefore entitled as a matter of equity to recover these benefits from Defendants and for all such additional relief as this Court deems proper.

## COUNT IX
### FRAUD
### (AS TO DEFENDANTS PREMIER ATHLETICS, THE VARSITY DEFENDANTS, DEFENDANT USASF, AND DEFENDANT USA CHEER)

363.     Plaintiffs reallege the preceding paragraphs as though repeated verbatim.

364.     At all times relevant to this complaint, Plaintiffs were parties to numerous annual contracts whereby Plaintiffs agreed to pay Defendants annual and recurring fees in exchange for a safe competitive environment and training facility.

365.    As part of the agreements, Defendants represented to Plaintiffs that Defendants would be responsible for ensuring a safe environment for Plaintiffs including an environment free from sexual, physical, and mental harm and exploitation.

366.    Defendants' promises were material to Plaintiffs' agreements, without which no agreements would have existed.

367.    Plaintiffs had a right to rely upon Defendants' promises and did so rely.

368.    As set forth herein, even at the time they entered into the agreements with Plaintiffs, Defendants knew or had a reckless disregard for whether the environment they provided at competitions was safe and free from harm and sexual, physical and mental abuse.

369.    In fact, at all times relevant to this complaint, Defendants knew that the environment they provided actually facilitated access to underage athletes by predators, including coaches, choreographers, and other adults.

370.    Yet, with knowledge or a reckless disregard for whether Defendants were providing safe environments for child athletes, Defendants nevertheless entered into the agreements and began collecting fees from Plaintiffs.

371.    Upon information and belief, Defendants' misrepresentations included, without limitation:

a. Certifying to Plaintiffs that they were responsible for providing safe gyms and competitive environments;

b. Certifying to Plaintiffs and their families that the adults involved in the competitions, including coaches who were allowed to participate in competitions, had been duly vetted;

c.   Allowing coaches to continue participating and accessing child-athletes even after Defendants knew the coaches had exhibited disturbing behavior, such as providing alcohol and drugs to minors;

d.   Allowing adult athletes to become certified coaches even after the athletes exhibited disturbing behavior, such as engaging in sexually explicit messages with minors, and giving drugs and alcohol to minors;

e.   Facilitating an unchaperoned environment for child-athletes;

f.   Fostering a party culture for child athletes, including an environment where alcohol and drugs were readily available;

g.   Encouraging coaches to create a steady stream of new child athletes for the time that the current athletes aged out;

h.   Failing to provide appropriate security to ensure a safe environment for child athletes free from harm;

i.   Failing to enforce, implement, or abide by policies and procedures related to vetting, security, and screening;

j.   Such additional conduct as may be revealed during discovery and the trial of this case.

372.   As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained and will continue to sustain significant injuries and damages.

373.   Plaintiffs now seek an order from this court setting aside the agreements and declaring them null and void, as well as for damages in an amount to compensate Plaintiffs for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

## COUNT X
## (NEGLIGENT SECURITY)
## AS TO THE VARSITY DEFENDANTS, DEFENDANT BAIN CAPITAL, DEFENDANT CHARLESBANK, DEFENDANT PREMIER ATHLETICS, DEFENDANT USASF, AND DEFENDANT USA CHEER

374.    Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

375.    At all times relevant to this complaint, the Varsity Defendants, Defendant Bain, Defendant Charlesbank, Defendant Premier Athletics, Defendant USASF and Defendant USA Cheer sponsored, created, hosted, and oversaw gyms, camps, and competitions where young adult athletes would converge at pre-determined locations, pursuant to rules and restrictions established and governed by Defendants, and under the supervision, direct or implied, of Defendants.

376.    The Varsity Defendants, and Defendants Bain Capital and Charlesbank, Defendant Premier Athletics, Defendant USASF and Defendant USA Cheer, received substantial revenue from these events and related to the conduct described herein.

377.    As part of their self-promotion, the Varsity Defendants, and Defendants Bain Capital, Charlesbank, Defendant Premier Athletics, Defendant USASF and Defendant USA Cheer, undertook a responsibility to ensure that the premises and events were safe for minor athletes.

378.    The Varsity Defendants, and Defendants Bain Capital, Charlesbank, Defendant Premier Athletics, Defendant USASF and Defendant USA Cheer, violated their responsibility to provide safe premises free from harm from third parties in one or more of the following particulars:

      a.    Disparate enforcement of policies, procedures, and guidelines related to coaching suspensions, with the result that coaches such as Defendant Frizzell were still not permanently banned from interacting with minor athletes;

b.   Failure to provide adequate monitoring at the gyms, camps, events and competitions;

c.   Failure to undertake sufficient background checks;

d.   Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to drugs and alcohol while attending Varsity events;

e.   Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to pornographic images, or were not solicited to provide pornographic images while attending Varsity events or cheering for or on the premises of USASF member-gyms;

f.   Exposing minor athletes to potential harmful adults with knowledge or a reckless disregard for the safety of the minor athletes;

g.   Failing to ensure that adult coaches and athletes were not forcing themselves upon minor athletes;

h.   Failing to ensure that underage athletes were not being forced into non-consensual sexual encounters with adults; and

i.   Such additional conduct as may be revealed during discovery.

379.   As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained and will continue to sustain significant injuries and damages.

380.   Plaintiffs now seek judgment against Defendants and for damages in an amount to compensate Plaintiffs for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

<u>**COUNT XI**</u>
**(INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)**
**AS TO ALL DEFENDANTS**

381.    Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

382.    As set forth herein and above, at all times relevant to this complaint, Defendants had a duty or duties to Plaintiffs to use due and reasonable care to protect Plaintiffs from foreseeable harm in a number of particulars, and not to inflict physical, emotional, or psychological injury upon the Plaintiffs, to wit:

    a.  Through the gym certification process, representing that certain gyms, coaches, trainers, and owners were safe;

    b.  Endorsing certain gyms, coaches, and trainers through the gym certification process, as well as through brand endorsements, and ambassadorships;

    c.  Creating a system of self-governance and regulation, and undertaking responsibility for reporting, compliance, and internal investigations;

    d.  Hiring coaches who would be provided access to minor children;

    e.  Creating open teams, and environments where adult athletes were likely to intermingle with child athletes;

    f.  Incentivizing one-on-one coaching;

    g.  Facilitating access to minor children;

    h.  Such other particulars as may be revealed during discovery.

383.    As set forth herein and above, Defendants violated their responsibilities to Plaintiffs in one or more particulars, including:

    a.  Certifying to Plaintiffs that they were responsible for providing safe gyms and competitive environments;

b.  Certifying to Plaintiffs and their families that the adults involved in the competitions, including coaches who were allowed to participate in competitions, had been duly vetted;

c.  Allowing coaches to continue participating and accessing child-athletes even after Defendants knew the coaches had exhibited disturbing behavior, such as providing alcohol and drugs to minors;

d.  Allowing adult athletes to become certified coaches even after the athletes exhibited disturbing behavior, such as engaging in sexually explicit messages with minors, and giving drugs and alcohol to minors;

e.  Facilitating an unchaperoned environment for child-athletes;

f.  Fostering a party culture for child athletes, including an environment where alcohol and drugs were readily available;

g.  Encouraging coaches to create a steady stream of new child athletes for the time that the current athletes aged out;

h.  Failing to provide appropriate security to ensure a safe environment for child athletes free from harm;

i.  Failing to enforce, implement, or abide by policies and procedures related to vetting, security, and screening;

j.  Disparate enforcement of policies, procedures, and guidelines related to coaching suspensions, with the result that coaches such as Nick Frizzell were still not permanently banned from interacting with minor athletes;

k.  Failure to provide adequate monitoring at the gyms, camps, events and competitions;

l.   Failure to undertake sufficient background checks;

m.   Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to drugs and alcohol while attending Varsity events;

n.   Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to pornographic images, or were not solicited to provide pornographic images while attending Varsity events or cheering for or on the premises of USASF member-gyms;

o.   Exposing minor athletes to potential harmful adults with knowledge or a reckless disregard for the safety of the minor athletes;

p.   Failing to ensure that adult coaches and athletes were not forcing themselves upon minor athletes;

q.   Failing to ensure that underage athletes were not being forced into non-consensual sexual encounters with adults;

r.   Such additional conduct as may be revealed during discovery.

384.   Defendants' conduct set forth above is so outrageous so as to be unacceptable in a civilized society.

385.   Moreover, Defendants conduct has directly and proximately caused serious, severe, and pervasive emotional and mental injury to Plaintiffs, and will require reasonable certain future care.

386.   Plaintiffs now seek judgment against Defendants and for damages in an amount to compensate Plaintiffs for the physical, psychological and emotional harm caused by Defendants'

conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper

## JURY TRIAL DEMANDED

387.    Plaintiffs hereby demand a jury trial for the allegations and causes of action set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award the following damages, jointly and severally against Defendants, as provided by United States law and Tennessee law, including but not limited to the following:

a.    Compensatory, actual, and consequential damages to Plaintiffs, trebled where permitted by statute;

b.    Alternatively, liquidated damages as to Count I;

c.    Costs of this action and attorneys' fees to Plaintiffs;

d.    Equitable relief, including, where deemed appropriate, injunctive relief;

e.    Punitive damages where permitted by statute; and,

f.    Any and all other and further relief as this Court may deem appropriate.

This 6th day of October, 2022.

Respectfully submitted,

**CLEMMONS & CLEMONS, PLLC**

/s/ John Ray Clemmons
John Ray Clemmons (TN BPR No. 025907)
J. Michael Clemons (TN BPR No. 024362)
414 Union St., Suite 1900
Nashville, TN  37219

Telephone: (615) 823-1201
Facsimile: (615) 823-1194
Email:  johnray@clemlawfirm.com
michael@clemlawfirm.com
*Co-counsel for Plaintiffs*

   And by

Bakari T. Sellers (SC Fed. ID No. 11099)
Joseph Preston Strom (SC Fed. ID No. 4354)
Mario A. Pacella (SC Fed. ID No. 7538)
Amy E. Willbanks (SC Fed. ID No. 13537)
Jessica L. Fickling (SC Fed. ID No. 11403)
Alexandra Benevento (SC Fed. ID No. 10734)
6923 N. Trenholm Road, Suite 200
Columbia, South Carolina 29206
Phone:  (803) 252-4800
Email: bsellers@stromlaw.com
   petestrom@stromlaw.com
   mpacella@stromlaw.com
   awillbanks@stromlaw.com
   jfickling@stromlaw.com
   abenevento@stromlaw.com

*Attorneys for Plaintiffs*

*PHV Petitions Forthcoming